[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. Nature of Proceedings
This action for dissolution of marriage and other relief came to the Regional Family Trial Docket on referral from the Judicial District of Hartford. The plaintiff wife has been represented by counsel. The defendant husband has acted pro se. The children have been represented by counsel and have had the assistance of a Guardian Ad Litem. Over 9 trial days the parties presented evidence on the issues of custody and visitation of the children as well as child support, alimony, health insurance, division of assets and liabilities and fees for the attorney for the attorney for the minor children and the Guardian Ad Litem. Many exhibits were entered into evidence. The court has considered all of the credible evidence and all of the statutory criteria for the orders to be issued. The statutory criteria will not be restated here.
II. Facts
The parties were married on February 23, 1990 in Hartford, Connecticut. They have two minor children of this marriage, namely Matthew Daven Shand born June 5, 1992, and Tyler Christopher Shand born January 9, 1997. No other minor children have been born to the wife since the date of the marriage. The plaintiff has been the recipient of state assistance. The interests of the State of Connecticut have been represented by the Attorney General's office. No one from the Attorney General's office appeared at trial or presented any evidence.
The plaintiff, Sandra E. Pottinger-Shand ("Ms. Shand"), is 35 years old. She has a high school education. Her physical health is generally good. She has a history of emotional problems dating back to the time CT Page 6403 following her graduation from high school in 1983. She was hospitalized for depression with suicidal thoughts for five weeks at Mt. Sinai Hospital in Hartford and then two weeks at Cedarcrest State Hospital in Newington before returning to her parent's home. She continued to participate in counseling on an outpatient basis at the Village for Families and Children, and she began working full time and living independently in 1985. She has had continued bouts of depression since that time. She was hospitalized briefly at New Britain General Hospital in December, 1988 and in February, 1989 because of depression. Since that time she has participated in therapy at the Village for Families and Children for twelve years and, more recently at Interval House. Her present emotional status is good. Ms. Pottinger worked at Stop and Shop from April 1997 until September 2000. At that time she left to take a position as a front desk clerk at the Glastonbury Wellness Center.
The defendant, Calum Shand ("Mr. Shand"), is 39 years old. He was born and raised in Scotland where he attained the equivalent of a high school diploma. He was a professional soccer player for three years and then began coaching soccer. He came to the United States in 1983 where he conducted soccer clinics. He began taking college courses and received a Bachelor of Arts degree in psychology from Central Connecticut State University in 1988. He went on to study neuro-linguistic programming and Eriksonian Hypnosis at the North East Institute for Neuro-Linguistic Programming. For several years he carried on a private psychotherapy practice in West Hartford which he has abandoned. From 1993-1995 he was employed as a case manager at InterCommunity Mental Health Group. In February 1998 he was employed by Wheeler Clinic as a crisis worker and on October 30, 1998 he resigned that position. He now works as a self-employed house painter.
The marriage has been filled with tumult and upheaval. Both parties have been arrested several times for domestic violence incidents in which both received injuries. There have been DCF referrals based upon the physical violence toward each other in the presence of the children. They have written each other venomous letters filled with vulgar insults and threats. Neither party has any alcohol or substance abuse issues. Both parties have bad tempers. Neither party has been violent with the children although Ms. Pottinger's sister hit Matthew with a belt buckle when she was babysitting. Mr. Shand is especially gentle with the children. Both parties have been guilty of speaking negatively of the other party in the presence of the children. Since April 23, 1999 Mr. Shand has been subject to a restraining order which has prevented him from having any contact with Ms. Pottinger.
When the parties separated in 1995 Mr. Shand moved to an apartment close to where Ms. Pottinger continued to live. The parties took care of CT Page 6404 Matthew on a shared, open basis. Mr. Shand took Matthew with him on a visit to his parent's home in Scotland and away on several business trips including an extended trip to Hawaii. The parties continued to have extensive contact including sexual relations. Tyler was born in January 1997 when the parties were separated. However, hostilities intensified during the next two years and there were incidents in which the parties would fight and the police would be called. This action for dissolution was commenced, pro se, by Ms. Pottinger in December 1998. Initially the parties anticipated an uncontested process in which an agreement would be reached for joint custody and equal parenting time. But, hostilities escalated dramatically when Mr. Shand told Ms. Pottinger that he had a girl friend staying with him at his apartment. Ms. Pottinger went to Mr. Shand's apartment and caused a scene. Both parties ended up getting arrested. Soon after this incident Ms. Pottinger engaged an attorney, amended her complaint to include sole custody, and obtained a restraining order preventing Mr. Shand from having any contact with her.
Each blames the other for all of their problems. Each has a theme which was repeated time and again at the trial. Ms. Pottinger feels that Mr. Shand is physically dangerous and psychologically manipulative. Mr. Shand feels that Ms. Pottinger has fallen under the spell of radical feminist counselors and attorneys who have "brain washed" her against him. Neither of these themes was proven. Fault for the breakdown of the marriage must be shared equally.
III. Discussion and Conclusions
The court has already found that it has jurisdiction over the marriage, that one party has resided in Connecticut continually for more than one year prior to bringing this action, and that the marriage of the parties has broken down irretrievably with no hope of reconciliation. On February 6, 2001 the court dissolved the marriage and restored the plaintiff's maiden name, Sandra Pottinger.
The primary issue to be decided by this court is custody of the minor children. Section 46b-56 (b) of the General Statutes provides:
In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference. . . .
The following quotation from the case of Raymond v. Raymond,165 Conn. 735, 741 (1974) sets forth the rule of law upon the issue of custody: CT Page 6405
Where custody and visitation rights have been affected, a court has the power and the duty to safeguard those rights while recognizing that such interests are subordinate to the welfare of the children. Neither parent's interests with regard to his or her children are a property right nor are they rights which cannot be terminated without his or her consent. A contest relative to custody, such as visitation rights, is not one primarily to determine the rights of the respective parties but rather a determination of the best interests of the child or children.(Citations omitted)
Joint custody is not an available option in this case. Neither party sought joint legal custody at trial. Therefore, the court does not have the authority to award joint legal custody. Emerich v. Emerich,5 Conn. App. 649, 658 (1985). Furthermore, the hostility level between the parties is so high that joint custody would be unworkable. Therefore, the court must select one of the parents as sole legal custodian. In determining which parent should have custody, certain factors tip the scales in favor of Ms. Pottinger. These factors are as follows.
First, Ms. Pottinger has demonstrated more concern for the welfare of the children when measured by two of the basics of life, food and shelter. Although lacking the education of Mr. Shand, Ms. Pottinger has managed to provide the children with a spacious apartment, well furnished, with a separate bedroom for the children, a full kitchen where balanced, nutritious meals can be prepared, and a neighborhood where the family can live in relative safety. She has done this through a combination of her earnings and government benefits. Mr. Shand, on the other hand, has a rented motel room at the Great Meadows Inn on the Silas Deane Highway in Rocky Hill. The room does not have a proper kitchen or furnishings. The sink in the bathroom serves as the kitchen sink as well. The children and their father end up going out to eat at fast food restaurants quite frequently. The children do not have their own private space to be alone if they wish. Until the last two months there was only one bed in the room and the children and their father all slept together. The new room is larger and has two queen sized beds; but the children must still sleep together. At the time of the Family Relations evaluator's visit in the afternoon, there was a young man seen drinking beer while loitering around the entrance to the motel's inner corridor closest to Mr. Shand's room.
Superior housing and food do not necessarily equate to superior parenting. But, in considering legal custody, this disparity in housing and meals provided by the two parents is important as a reflection of the extent to which the parents are willing put aside there own wishes for the benefit of their children. Mr. Shand is capable of providing much CT Page 6406 better housing and meals than he has been doing. However, this would mean getting a better job at higher wages, something which he has deliberately avoided doing for selfish reasons. Mr. Shand told both the Guardian Ad Litem and the Family Relations evaluator that he was intentionally minimizing his income because he does not want Ms. Pottinger to benefit financially. This indicates that he values his own interests above the physical welfare of his children.
Second, Mr. Shand has shown a lack of good common sense in some of his parental decisions. Most troubling are Matthew's school records which show that he has been tardy 16 times during the present school year when in Mr. Shand's care. Mr. Shand attempted to justify this by saying that he has a hard time getting Matthew out of the car and into school because Matt misses his father so much on the present visitation schedule. The simple solution to this problem would be for Mr. Shand to arrive at school a bit earlier to allow for the lengthy separation period. But, Mr. Shand has been unable or unwilling to make this common sense change in his routine. Matthew has not been tardy this year when brought to school by Ms. Pottinger. Another example of Mr. Shand's lack of good common sense parenting is reflected in the way Tyler arrives at day care. When Tyler is brought by Ms. Pottinger, he is neat and clean and has a healthy lunch. When Tyler comes with Mr. Shand, he frequently has stained clothes and food on his face, and has a "junk food" lunch with soda, candy and chips. A final example of Mr. Shand's lack of common sense occurred when Mr. Shand allowed Tyler to sit on his lap when Mr. Shand was pulling up the driveway of Tyler's day care center. The day care center reported this incident to the Department of Children and Families. Although Mr. Shand insisted that Tyler had been in his seat belt until they got into the driveway, rather than simply admitting a lapse of judgment, Mr. Shand called the director of the day care center to say that he was going to ". . . shove a law suit up your ass so far it will never see the light of day". He told the DCF worker essentially the same thing. Mr. Shand compounded his problems at trial with his persistent cross examining about this relatively harmless incident when he produced the revelation that Tyler told the DCF worker assigned to investigate this incident that when he drives with his father he can sit in the front seat and he doesn't have to wear his seatbelt.
Third, Mr. Shand demonstrated through his testimony and behavior in court that he is extremely arrogant about his parenting ability. He is someone who is so convinced of his own intelligence that he may be unwilling or unable to deal effectively with the other people who will need to be involved with educational, medical, and psychological decisions to be made on behalf of the children. It is a concern that Mr. Shand may be unwilling to accept the reasonable advise of teachers, doctors, dentists and psychologists. Mr. Shand over-estimates his own CT Page 6407 ability. Mr. Shand seemed to think that he did a fine job representing himself at the trial. In fact he did a poor job of representing his own interests. Time and again he inadvertently revealed negative evidence about himself. In support of his position that he is an expert on child development he testified that he thought it was a good idea that he and a friend of his provided psychological treatment to Matthew after a traumatic incident. He is dismissive of the treatment being offered to the children by an independent psychologist. Those who disagree with Mr. Shand or who challenge his thinking are dismissed as ignorant. This is not a prudent attitude for a parent to take. Being a good parent requires a bit of humility. Humility is not Mr. Shand's strong suit. Ms. Pottinger is much more likely to seek assistance in making the tough decisions which all parents must make. If Ms. Pottinger is awarded sole legal custody and is required to consult Mr. Shand about all major parental decisions, the court has confidence that, although she will not be happy to have to consult Mr. Shand, she will do so. The court has no confidence that Mr. Shand would do so if the roles were reversed.
The Family Relations evaluator, Roger Frigon, recommended that Ms. Pottinger be given sole legal custody of the children. His report and testimony were thorough and well documented. The Guardian Ad Litem, Robert Zaslow, also recommended that Ms. Pottinger be awarded sole legal custody. The testimony of Attorney Zaslow was especially persuasive in that he had heard all of the other testimony in the case, had spoken with the children several times in a variety of settings, including a few days before his testimony, and he had seen Mr. Shand's most recent hotel room. The attorney for the minor children did not take a position on the issue of legal custody.
The issue of physical custody and a parenting schedule can be decided on the basis of the same considerations. All of the professionals in the case recommended that Ms. Pottinger be the primary residential custodian but that Mr. Shand have more parenting time with the children than he has under the present pendente lite schedule. These recommendations have been made in spite of the substandard accommodations which Mr. Shand provides at the moment. The children have a strong desire to see their father more. Despite the faults set forth in this decision, Mr. Shand is loving and gentle with the children and is willing to give ceaselessly of his time. The children love to be with him. When the children get a little older, his present accommodations will be inadequate. At the moment they are minimally adequate to permit substantial over-night visiting. Therefore, the court will adopt the general schedule recommended by Mr. Frigon and Attorney Zaslow.
Ms. Pottinger forcefully urged the court not to award any child support. Ms. Pottinger receives reduced rent and child care tuition based CT Page 6408 upon her own earnings. If child support is ordered, her rent and child care will increase even if she never actually receives any money from Mr. Shand. She anticipates that Mr. Shand will never pay even if ordered to do so. A wage execution cannot be utilized at this time because Mr. Shand is self-employed. The current pendente lite child support order is $1 per week. The State of Connecticut is pursuing Mr. Shand for an arrearage of $5415.35 and already has a weekly order of $10 from the Family Support Magistrate Court in Hartford. Presumably they will continue to pursue their interests in that forum because they did not appear for trial and present evidence in this case. Mr. Shand's financial affidavit is totally lacking in credibility. There was no credible evidence upon which to base a finding of earning capacity at this time; Ms. Shand had no incentive to present any evidence on this issue, and the State of Connecticut chose not to participate in the trial. Therefore, no child support order will be entered at this time other than the nominal order of $1 per week. The parties will be left to their remedies in the Family Support Magistrate Court.
Ms. Pottinger seeks a permanent restraining order against Mr. Shand prohibiting all contact. The evidence is clear that both parents have been violent with each other. It has been harmful for the children to have witnessed some of this violence. Personal contact between the parties must be limited. Mutual restraining orders are appropriate. However, the parties must be able to communicate with each other by telephone, FAX and Email about the parenting schedule or other issues regarding the welfare of the children.
The parties have argued over the telephone contact between the children and their father. It is Ms. Pottinger's position that Mr. Shand calls the children every night and keeps them on the line for long periods of time, disrupting the children and their normal routine. It is Mr. Shand' s position that there should be no limitation on telephone calls to the children. Ms. Pottinger has taped some of the calls and has instructed the children not to discuss certain topics with Mr. Shand, thereby adding to the upset of the children. Both parties make valid points. The children should be able to speak by telephone with either parent and discuss any topic. But the parents should not be able to disrupt the routine of the other household by calling the children and keeping them on the telephone for endless conversations.
IV. Orders
The court issues the following orders:
1. The marriage of the parties was previously dissolved. CT Page 6409
2. Ms. Pottinger shall have sole legal custody of the minor children. Ms. Pottinger is ordered to consult with Mr. Shand before making any major decisions pertaining to the children's educational, medical, dental, emotional, economic, or religious welfare. She must consider his opinions and recommendations on these issues with a view to arriving at a harmonious policy calculated to promote the best interests of the children. Ms. Pottinger shall be the final decision maker if they reach an impasse on these issues. Both parties shall have equal access to educational, medical, dental or psychological information about the children. Both parties shall have the right to make emergency medical and dental decisions when the children are in their care provided that notice is given to the other party as soon as possible. Both parties shall have equal access to the children at the hospital or treatment center.
3. Ms. Pottinger shall have physical custody of the minor children. Mr. Shand shall have unsupervised parenting time with the minor children as follows:
a. Alternate weekends from Friday at 9:15 a.m. for Tyler and at the end of the school day (3:00 p.m.) for Matthew until Monday morning at 9:15 a.m. at day care for Tyler and at the start of school for Matthew (9:00 a.m.);
b. Alternate Tuesdays (on the week that follows the children's weekend with their mother) at 3:15 p.m. for Tyler and at the end of the school day (3:00 p.m.) for Matthew until Wednesday morning at the start of school for Matthew (9:00 a.m.) and until 9:15 a.m. at day care for Tyler;
c. Alternate Thursdays (on the week that precedes the children's weekend with their mother) at 3:15 p.m. for Tyler and at the end of the school day (3:00 p.m.) for Matthew until Friday morning at the start of school for Matthew (9:00 p.m.) and until 9:15 a.m. at day care for Tyler;
d. If there is no school on a day that Mr. Shand is scheduled to deliver the children to school and day care, Mr. Shand shall have the option to keep the children during the day and transfer them to Ms. Pottinger at 5:00 p.m. If Mr. Shand decides to have the children go to day care, he shall be responsible for paying for Matthew;
e. During the children's summer vacation the above schedule shall be modified so that Mr. Shand will have alternate, uninterrupted weeks (7 days) with the children. In addition, each party shall be entitled to spend 2 full, consecutive weeks (14 days) with the children as a summer vacation. Information regarding the scheduling of this 2 week vacation CT Page 6410 must be exchanged at least 60 days in advance. If the vacation involves travel away from home, the information submitted to the other party must include the address of the destination (including telephone numbers for emergency contact) and travel arrangements, (including departure and return times and flight numbers);
f. Easter Sunday, Independence Day, Thanksgiving Day, and Christmas Day (10 a.m. until 9 p.m.) during odd numbered years;
g. New Year's Day, Memorial Day, Labor Day, and Christmas Eve (3 p.m. on December 24 until 10 a.m. on December 25) during even numbered years;
h. Every year on Father's Day (9:00 a.m. until 5:00 p.m.). The children will observe Mother's Day (9:00 a.m. until 5:00 p.m.) with Ms. Pottinger every year, even if it falls on one of Mr. Shand's days with the children;
i. During the school year there will be few direct exchanges of the children between the parties because most of the exchanges will be at school or at day care. On holidays, during vacations, or at other times when there must be a direct exchange of the children between the parties, these exchanges shall occur at the Glastonbury McDonald's. If the McDonald's is closed, the exchange may occur at the Glastonbury Police Station.
4. There shall be no child support order issued at this time other than a nominal order of $1 per week. The State of Connecticut and Ms. Pottinger shall be free to pursue all available remedies in Family Support Magistrate Court in Hartford including, but not limited to, an arrearage previously found in the Support Magistrate file No. FA92-061 31 24.
5. Each party shall pay alimony of $1 per year modifiable by the State of Connecticut pursuant to C.G.S. Section 46b-82.
6. Each party shall maintain such medical insurance for the minor children as may be available at reasonable cost through their place of employment or through the Husky Plan. The parties shall share equally any unreimbursed medical expense of the minor children, including dental, optical, prescription medication, orthodontic, and counseling expense.
7. The personal property of the parties has been divided to their mutual satisfaction. The personal property in the possession of the parties shall be theirs, free of any claim of the other party.
8. Except for emergencies, neither party shall telephone the children when they are in the care of the other party except between 7:45 p.m. and CT Page 6411 8:15 p.m. and for no longer than 15 minutes. Neither parent shall attempt to prohibit the children from discussing certain topics during these telephone calls. However, neither parent shall question the children about the other parent and his or her schedule.
9. The parties shall remain jointly and severally liable on the Citibank Mastercard and Mobile Oil Company credit card debts. Subject to that exception, each party shall be liable for the debts shown on his or her own financial affidavit and shall indemnify and hold the other harmless thereon. Mr. Shand shall pay and hold Ms. Pottinger harmless on any debt to the Internal Revenue Service arising from Mr. Shand's failure to file tax returns or pay taxes during the marriage.
10. Until further order of the court the parties shall be enjoined and restrained as follows:
a. Neither party shall come within 50 feet of the other except at the time the children are exchanged.
b. Neither party shall come within 10 feet of the other when the children are exchanged.
c. Neither party shall enter or approach the other's residence, motor vehicle or the other's place of employment including the driveways and parking lots.
d. Neither party shall call, FAX, mail or Email the other party at home except to discuss the parenting schedule or other issues regarding the welfare of the children. Neither party shall call, FAX, or Email the other party at work except for medical emergencies involving the children.
e. Neither party shall discuss this litigation with the children nor shall either party disparage the other party to children.
11. The attorney for the minor children and the Guardian Ad Litem shall continue to serve for a period of six months for the purpose of monitoring and facilitating compliance.
12. The attorney for the minor children, Attorney Ira A. Jacobs, spent 133.1 hours on this case. The Guardian Ad Litem, Attorney Robert D. Zaslow, spent 109.8 hours on this case. These expenditures of time are found to be reasonable. Pursuant to C.G.S. Section 46b-62 and Practice Book Section 25-62 the fees and costs of the attorney for the minor children and the Guardian Ad Litem shall be submitted to the Judicial Branch for payment and shall be recoverable at normal state rates. Any CT Page 6412 subsequent expenditures of time may also be submitted for payment to the Judicial Branch.
12. There shall be no order restraining Mr. Shand's contact with the attorney for the minor children or the Guardian Ad Litem.
13. There shall be no order restraining Jonathan Alpert from having contact with the minor children when they are with their father. However, unless Ms. Pottinger gives her consent in writing, Mr. Alpert shall not provide any neuro-linguistic programming, psychoanalysis, therapy, or counseling to the minor children.
14. The plaintiff shall resume her maiden name of Sandra Pottinger as previously ordered.
BY THE COURT, JOHN W. PICKARD JUDGE OF THE SUPERIOR COURT